## THE STATE v. ALEXANDER, *Appellant.*

### Division Two, January 31, 1894.

1. **Criminal Law:** FALSE PRETENSES, OBTAINING DEED BY.   The evi-dence in this case *held* to support a conviction of obtaining a deed to land by means of false pretenses and with intent to cheat and defraud.

2. ——: ·——: INSTRUCTION.   It appeared on the trial that prior to obtaining the deed set out in the indictment the prosecuting witness and her husband gave the defendant a quitclaim deed for the same premises which also contained a general power of attorney, but such deed was not acknowledged.   *Held* that the court properly refused to instruct that if such deed was given to the defendant prior to the deed set forth in the indictment the jury must acquit.

119  447
126  514

119  447
132  125
132  182
134  148
119  447
136  595

*Appeal from St. Louis Criminal Court.*—Hon. H. L. Edmunds, Judge.

AFFIRMED.

Indicted at the May term of the St. Louis criminal court under the provisions of section 3564, Revised Statutes, 1889 for obtaining from one Charlotte Mittelberger and her husband a deed to certain real estate of the value of $3,000, in the city of St. Louis, by means of false pretenses with intent to cheat and defraud, the defendant, a negro, was tried and convicted of that offense at the January term, 1893, his punishment assessed at imprisonment in the penitentiary for the term of five years, and he appeals to this court.

The indictment is the following: "The grand jurors of the state of Missouri within and for the body of the city of St. Louis, now here in court, impaneled, sworn and charged upon their oath present, that Lafayette D. Alexander late of the city of St. Louis aforesaid, and state aforesaid, on the fifth day of April in the year of our Lord one thousand, eight hundred and ninety-two at the city of St. Louis aforesaid, feloniously, intentionally, falsely and designedly with intent to cheat and defraud one Charlotte Mittelberger did feloniously and falsely pretend and represent to the said Charlotte Mittelberger that he the said Lafayette D. Alexander had a purchaser for the sum of $1,000 for a piece of real estate consisting of twenty feet of ground on the south side of Patterson avenue in city block 4080 in said city together with a house thereon then and there owned by said Charlotte Mittelberger and her husband James Mittelberger; that a certain document in writing which he the said Lafayette D. Alexander then and there presented to her the said Charlotte Mittelberger was a deed

to said pretended purchaser for said lot and house thereon; that he the said Alexander had shown said document in writing to the brother-in-law of said Charlotte Mittelberger, to wit: one Gotlieb Stahlhuth, and that said Stahlhuth had investigated said document in writing and had said it was all right and that she the said Charlotte Mittelberger and her husband should sign it as he the said Stahlhuth was busy and could not leave; and the said Charlotte Mittelberger believing the false pretenses and representations so made as aforesaid to be true and relying and confiding in the same and being deceived thereby was induced by reason thereof together with her husband the said James Mittelberger to sign, execute, acknowledge and deliver to the said Lafayette D. Alexander a document in writing, to wit, a quitclaim deed conveying for a pretended consideration of $312 to the said Lafayette D. Alexander all her right, title and interest and all the right, title and interest of her husband James Mittelberger in and to the following described lots, tracts and parcels of land lying, being and situate in the city of St. Louis and state of Missouri, to wit: a part of lot 1, of block 8 of Fairmount subdivision and in block number 4080 the said city of St. Louis, beginning at a point in the south line of Pattison avenue ninety-two feet distant east of the east line of Cooper street, thence running eastwardly along the south line of Pattison avenue sixty feet thence southwardly and paralled to the east line of Cooper street one hundred and seventy feet to the north line of lot 2 of said block, thence westwardly along the said north line sixty feet, thence northwardly and parallel to the said east line of Cooper street one hundred and seventy feet to the south line of Pattison avenue and the place of beginning, together with all improvements thereon consisting of three houses and all of the value of $3,000; and that the said Lafayette

D. Alexander, by means of the said false pretenses and representations, so made to the said Charlotte Mittelberger as aforesaid, unlawfully, feloniously and designedly did obtain of and from the said Charlotte Mittelberger and James Mittelberger a conveyance to himself, the said Alexander, in fee of the said real estate last above described of the value of $3,000 and of the said Charlotte Mittelberger and James Mittelberger her husband with intent her the said Charlotte Mittelberger and him the said James Mittelberger then and there to cheat and defraud of the same; whereas in truth and fact he the said Alexander had no purchaser for the sum of one thousand dollars for said piece of real estate consisting of twenty feet of ground on the south side of Pattison avenue in city block 4080 in said city of St. Louis together with a house thereon then and there owned by said Charlotte Mittelberger; and whereas in truth and in fact said document in writing then and there presented to said Charlotte Mittelberger was not a deed to a pretended purchaser as aforesaid for said lot of twenty feet front on Pattison avenue with a house thereon but was in truth and fact a quitclaim deed purporting to convey to said Alexander for a pretended consideration of $312 all the right, title and interest of the said Charlotte Mittelberger and James Mittelberger her husband to the sixty feet of ground on the south line of Pattison avenue in city block 4080 with three houses thereon and of the value of $3,000 and owned by the said Charlotte Mittelberger and James Mittelberger as aforesaid and whereas in truth and fact he the said Alexander had not shown the said document in writing to the brother-in-law of the said Charlotte Mittelberger, to-wit: Gotlieb Stahlhuth; and whereas in truth and fact he the said Alexander had not just come from said Stahlhuth; and whereas in truth and fact said Stahl-

huth had not investigated said document in writing and in truth and fact had not seen it nor been shown it by said Alexander or by any one; and whereas in truth and fact said Stahlhuth had not said that it—meaning said document in writing—was all right; and whereas in truth and fact said Stahlhuth had not said that she the said Charlotte Mittelberger and James Mittelberger her husband should sign it; and whereas in truth and fact he the said Stahlhuth had not said that he was busy and could not leave;   contrary to the form of the statute in such case made and provided and against the peace and dignity of the state.

"WILLIAM ZACHRITZ,<br>"Assistant Circuit Attorney."

On the part of the state, the evidence was in substance and effect the following:   The defendant is a sort of real estate agent and also an occasional preacher. Mrs. Charlotte Mittelberger is an old German lady, unable to read or write English; her husband is not only quite old, but also very infirm, and unable to transact business.   The real estate in question, sixty by one hundred and seventy feet on Pattison avenue, had been conveyed to Mr. Mittelberger, by him and his wife, reconveyed to their grantor, and then conveyed again to Mrs. M.   She had built three houses on the land, dividing it into lots of twenty feet front each, and had borrowed $300 on the property.   The property was valued by an expert at $2,800 or $3,000.

Her dealings with the defendant in relation to this property were thus narrated by her:   "I was going to sell my property, and my brother-in-law (Mr. Stahlhuth) brought Alexander to my house, saying he would sell it for me.   Alexander asked me where my property was; I told him; he asked me how much I wanted; I told him $3,000 for the three houses, or $1,000 apiece.   He said he could get that very easily;

that he knew he had a buyer right away for it. He asked for my deeds and I showed them to him; I told him I had bought the property from Mr. Scott (of Scott & Terry), and when he looked at the deeds he said, 'there is no good deed given you; Mr. Scott has given you no good deed; it has mountain heirs; they will pay the taxes for you, and after awhile they will take the property from you; it is better, as quick as you can, for you to get rid of it, and I will help you to do so.' He said he would have to take the deeds down town, and explained some of it, but I could not understand the big words he used, but I begged him to be honest with me, as I could not understand all; I told him I had borrowed $300 on the property, and that I had paid eight per cent. interest; he said that was too much, but his partner, Mr. Davis, would lift it; that is, he would sell one of the houses right away for $1,000 and give me $700, and so the rest of the property would be free.

"This was in March, 1892. At this conversation Mr. Stahlhuth was present, and it was arranged that Alexander should not make any transaction in regard to the property, without notifying and consulting my brother-in-law first, who was to be my guardian and trustee. I gave Alexander my three deeds; he gave me a receipt for them, and went away [which receipt was offered in evidence]. I have never seen the deeds since. He said he would need the deeds to get the $300 straightened out. About two weeks later he called on me and brought a large piece of paper; he didn't tell me what it was; he read a few words, and he said he would like for me and my husband to sign it. He said, 'this is merely to show where your property lies, so many front feet, so many feet deep.' I cannot read English. He said the paper was all in my favor; so I and my husband signed it. He then said

he needed $6 as he expressed it, to give him the right to sell the property. This sum I sent him and have his receipt for it [which receipt was shown in evidence]. Next, in April, he came a third time, and had a smaller piece of paper, and said, 'can you and your husband come down to Justice Hart's office and sign this paper? This was about 2 o'clock P. M.  He was in a great hurry.  He said 'be in a hurry; I'd like for you to be down there inside of half an hour.'  He told me to take the Marcus avenue car, and he would meet us there.  I asked him if he had seen Mr. Stahlhuth about this paper, and he said, 'I have just come from there; he has investigated it, and it is all right; he has no time to come.'  He started to read just a few words, and said, 'well, it's no use to read any further; it is all in your favor, and all you've got to do is for you and your husband to sign it; that doesn't concern him any.'  So we met him at Hart's office, where I signed the paper.  Mr. Hart asked me if I knew what was in the paper; I answered, 'yes, sir,' with the belief that Alexander said it was all in my favor.  Alexander told me, he had a buyer for the west house, and was to meet him that afternoon.  I asked how much he was to get for the house, and he said, 'a thousand.'  I said, don't give the deed till you get the cash.  'Cash,' he said, 'and I will be up after awhile and fetch you the money.'  He never came back, never paid me any money, and I have never seen the paper since.  The incumbrance of $300 was not lifted, and I have been paying the interest on it ever since."

This testimony, so far as it relates to the first interview with Alexander, was corroborated by Mr. Stahlhuth, who added that Alexander was to make out a power of attorney to sell the property, and that he (Stahlhuth) was to be made a trustee, so that no conveyance could be made without his joining, and that

Alexander was to receive $6 for drawing the necessary papers. He further stated that in the early part of April he met the defendant, who stated to him that he had sold the west house and lot for Mrs. M. for a $1,000 to a "Dago;" that he could "lift" the deed of trust and pay Mrs. M. $688 in cash; that the deed could be made in three or four days, and that it would be necessary for Stahlhuth to be present at the execution of it as Mrs. M.'s "trustee." This conversation (as it turned out) was on the same day that she and her husband signed the deed at Justice Hart's office. This witness testified that defendant showed witness no papers; that he did not say he was too busy to go around to Mrs. Mittelberger's house, and never told defendant to tell Mrs. Mittelberger to sign the papers, that they were all right. Learning afterward that the deed had been signed that day the witness went to the recorder's office and found there the record of the deed. This testimony of Stahlhuth was not denied by defendant.

The first paper executed by Mrs. Mittelberger and her husband to defendant is dated and was executed March 31, 1892, and is as follows:

"QUITCLAIM DEED WITH GENERAL POWER OF ATTORNEY.

"*The Indenture* made on thirty-first (31) day of March, A. D. one thousand, eight hundred and ninety-two, by and between Charlotte Mittelberger, James S. Mittelberger, husband, of the city of St. Louis and state of Missouri, parties of the first part, and Lafayette D. Alexander, of the city of St. Louis and state of Missouri, party of the second part,

"*Witnesseth:* That said parties of the first part, in consideration of the sum of three hundred (300) dollars to them paid in United States money by the said

party of the second part, the receipt of which is hereby acknowledged, do, by these presents, remise, release, and forever quitclaim unto the said party of the second part the following described lots, tracts or parcels of land lying, being and situate in the city of St. Louis and state of Missouri, to wit: A part of lot 1, of block 8, of Fairmount subdivision and in block forty hundred and eighty (4080), of the city of St. Louis, state of . Missouri, beginning at a point on the south line of Pattison avenue, ninety-two (92) feet distant east of the east line of Cooper street, thence running eastwardly along the said south line of Pattison avenue sixty (60) feet, thence southwardly and parallel to the east line of Cooper street, one hundred and seventy (170) feet to the north line of lot number two, of said block, thence westwardly along the said north line sixty (60) feet, thence northwardly and parallel to the said east line of Cooper street one hundred and seventy (170) feet to the south line of Pattison avenue, and the place of beginning. Being bounded on the north by Pattison avenue, on the east by a line distant one hundred and fifty-two (152) feet east of the east line of Cooper street, on the south by lot two (2), of said block, and on the west by property by now or formerly of Charles Weber.

"*Know all men by these presents:* Our said attorney in fact power to take possession of the above mentioned and described property, giving and granting unto our said attorney full power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done in and about the premises as fully, to all intents and purposes as we might or could do if personally present with full power of substitution and revocation, hereby ratifying and confirming all that our said attorney or his substitute shall lawfully do or cause to be done by virtue hereof.

"In witness this power irrevocable whereof we have hereunto set our hands and seals.

"CHARLOTTE · MITTELBERGER.   [SEAL]
"JAMES S. MITTELBERGER.   [SEAL]"

This instrument was not acknowledged or recorded. The second instrument executed by Mrs. Mittelberger and her husband to defendant for same property, bears date April 5, 1892, and is a quitclaim deed in ordinary form, recites a consideration of $312, and was acknowledged on the sixth day of April, 1892, and filed for record on the same day.

The defendant on his own behalf offered in evidence the quitclaim deed, with general power of attorney, and also the original deed of the property to Mr. Mittelberger, but withheld the other two, which he acknowledged he had received from the prosecutrix, and still held in his possession. He testified that he loaned Mrs. Mittelberger $300 about April 1, and had taken the first instrument to secure himself; that he was to collect the rents from the three houses ($7 monthly), as they fell due until he was repaid; that shortly afterward he let her have $312, for which she parted with all the property to him, because "she had got nothing out of it, and had had a good deal of difficulty in it." He said the ground was worth about $600, and that he "was not dealing with the houses."

There was evidence also by one Enoch Atkin, who was induced by a direct and leading question of defendant's counsel, to say that he saw money paid to Mrs. Mittelberger by defendant. Being further questioned by the same counsel, as to the amount, he stated it was "three hundred and odd dollars." This transaction is said to have occurred in April, 1892, but at what time is not stated, except it was before defendant's arrest. The venue of this transaction is laid at witnesses' house. This witness also says that when this money was paid

to Mrs. Mittelberger by defendant, that "she left the papers there with him." Isaac Atkin, a son of the last witness, testified that in March or April, 1892, at his father's house, he saw money on the table, and saw defendant pay Mrs. Mittelberger some money.

There was testimony also by Hyde, the clerk of the notary, Hart, that when the quitclaim deed of April 5, 1892, was brought to Hart's office for acknowledgment, he wrote out the certificate and asked "if the consideration had passed," when defendant spoke up and said "I have paid them 612 or 312," witness does not know which; that Mrs. Mittelberger and her husband heard this remark and made no reply; that no money was paid by defendant to Mrs. Mittelberger at that time. There was no explanation made of this deed to Mrs. Mittelberger, and the deed was only read down to and inclusive of the description of the property.

It was shown that the property in question was worth $2,800 to $3,000. Though defendant withheld the other two deeds of which he had obtained possession, yet on cross-examination he was forced to admit, and this without objection, that the first deed from Scott conveyed the property to the husband; the second from the husband and wife back to Scott, and the third deed was from the latter to Mrs. Mittelberger. There was other parol testimony received also without objection, showing that Mrs. Mittelberger paid for the property, and that she was the owner of it.

The instructions given at the instance of the state were these:

"1. The defendant stands charged in the indictment with inducing Charlotte Mittelberger, by means of false and fraudulent representations and false pretenses, to sign, execute, acknowledge and deliver to the defendant a quitclaim deed to certain real estate in the city of St. Louis; to this charge he pleads not

guilty, thereby raising an issue of fact between him and the state, which you, the jury, must determine from the evidence in the cause, in connection with which the court instructs you as follows:

"2. If you find and believe from the evidence, that at the city of St. Louis, and prior to the finding of the indictment, the defendant did unlawfully, fraudulently, falsely and designedly make to the said Charlotte Mittelberger the false and fraudulent representations and false pretenses set forth in the indictment, and if you further find and believe from the evidence, that by means of such false and fraudulent representations and false pretenses, the defendant did unlawfully and designedly obtain from said Charlotte Mittelberger her signature to the written instrument, to wit, the quitclaim deed mentioned and described in the indictment—and the acknowledgment and delivery of said deed by the said Charlotte. Mittelberger and James Mittelberger, her husband, to him, the said defendant, with the intent on the part of him, the said defendant, then and there to cheat and defraud the said Charlotte Mittelberger, as charged in the indictment, you will find the defendant guilty as charged in the indictment, and assess his punishment at imprisonment in the penitentiary for a term of not less than two nor more than five years. And unless you so find and believe from the evidence in the cause, you will acquit the defendant.

"3. The question of intent to cheat and defraud is one of fact for the jury to determine from all the evidence before them. This intent need not be specially proven—that is by direct and positive evidence—but in the absence of such, it may be lawfully and properly inferred by the jury from facts and circumstances in evidence having reference to and bearing upon that question.

"4. The defendant is a competent witness in his own behalf; but the fact that he is a witness testifying in his own behalf, and the interest he has at stake in the case, may be considered by the jury in determining the credibility of his testimony.

"5. The jury are the exclusive judges of the credibility of the witnesses. With that the court has nothing to do; and if you believe and find from the evidence that any witness has willfully testified falsely in any material fact in the case, you are at liberty to disregard the whole or any portion of such witness' testimony.

"6. The law presumes the defendant to be innocent, and this presumption continues until it has been overcome by proof which establishes his guilt to your satisfaction and beyond a reasonable doubt, and the burden of proving his guilt rests with the state. If, however, this presumption has been overcome by the evidence, and the guilt of the defendant established to a moral certainty and beyond a reasonable doubt, your duty is to convict. If of his guilt you are not convinced beyond a reasonable doubt, your duty is to acquit. But to justify an acquittal on the ground of doubt alone, it should be reasonable and substantial, and not a mere guess or conjecture of the possibility of innocence."

The defendant then asked this instruction: "The court declares the law to be, that if the jury believe from the evidence that the deed read in evidence, dated March 31, 1892, was given to the defendant by the prosecuting witness prior to the deed set forth in the indictment, then the jury will find for the defendant." Which the court refused to give, and the defendant excepted to such refusal, and also to the instructions given at the instance of the state.

*Henry B. Davis* for appellant.

(1) The court committed error in giving instructions for the state and in refusing instructions asked by defendant. (2) The evidence does not support the verdict. (3) The court erred in permitting the state to cross-examine the defendant as to matters not involved in his examination in chief. *State v. McGaw*, 74 Mo. 573.

*R. F. Walker*, Attorney General, and *C. O. Bishop* for the state.

(1) The indictment is sufficient under the statute. R. S. 1889, sec. 3564. (2) The court did not err in its rulings on the instructions. (3) The evidence sustains the verdict. (4) The court did not err in its rulings on the cross-examination of defendant.

SHERWOOD, J.—I. No objection is raised to the indictment, either in form or substance and we have discovered nothing objectionable in it.

II. As to the instructions given on behalf of the state, they are such as fully cover the crime charged, as well as such incidental points as are usually touched upon in criminal prosecutions. But one of the instructions thus given is attacked by defendant: the first, and this one, on the singular ground that it does not submit to the jury whether the representations made by defendant were false and fraudulent, but brands them as such, etc. There is no merit in this objection; this instruction leaves it to the jury to "determine from the evidence in the cause," whether the charge in the indictment was true, that defendant did obtain from Charlotte Mittelberger, a quitclaim deed, etc., by false and fraudulent representations, etc. Besides, this instruction directly

refers to the ones following in which the matters at issue are enlarged upon.

The instruction asked for by the defendant will be adverted to further on.

III. The evidence already recited discloses a case reeking with fraud from beginning to end. And it is quite worthy of note that defendant nowhere denies making the statements to Mrs. Mittelberger, nor to Stahlhuth as testified to by them, nor does he claim that they were true. So that thereby he confesses making them and impliedly admits their falsity. *State v. Musick*, 101 Mo. 260. And it must not be forgotten that along in the summer of 1892, after defendant had been arrested, he endeavored to effect a compromise with the prosecuting witness through her brother-in-law, Stahlhuth, asking the latter, "if he could not persuade his sister-in-law to *settle that.*" A similar attempt to hush the matter up or settle it was made by defendant with Mrs. Mittelberger's son. No denial was made by defendant of these attempts and therefore they also stand admitted. It is true that there is some testimony which tends to countervail that of Mrs. Mittelberger and other witnesses for the state, but the latter is so overwhelming as to leave no reasonable doubt of defendant's guilt.

Indeed, it may be said that the testimony of Hyde is not inconsistent with Mrs. Mittelberger's, placing, as she did, such confidence in defendant; unacquainted as she was with law and all its technicalities, she may well have concluded that there was nothing wrong with defendant's statement at the time to which Hyde refers. At any rate, to the jury belonged the determination of the issue of fact and their conclusion is final, unless some error occurred in the admission or rejection of evidence or the refusal of instructions; matters now to be examined.

IV.   The only instruction refused defendant, was that already set forth.   The nondescript instrument referred to in that instruction by reason of the fact of not being acknowledged, conveyed no title to defendant nor for the same reason was it effectual as a power of attorney to him.   Revised Statutes, 1889, section 2397; *Silvey v. Summer*, 61 Mo. 253.

It was the deed of April 5, 1892, and that alone, that conveyed any title to defendant; but it was competent to introduce the first instrument in evidence to show the fraudulent intent which animated defendant at the very inception of the transaction.   *State v. Myers*, 82 Mo. 558, and cases cited.   The instruction, therefore, was properly refused for this reason.   And in this connection it is proper to say that defendant, having withheld two of the deeds which showed the title to the property to be in Mrs. Mittelberger, is in no condition to take advantage of his own wrong.   *In odium spoliatoris* it will be presumed that the deeds withheld were all that is claimed for them, and that they showed the title to be in Mrs Mittelberger.   *Pomeroy v. Benton*, 77 Mo. 64, and cases cited.   Besides, the record shows that the defendant was forced on cross-examination to admit the fact of the *status* of the title to be as aforesaid.   And other witnesses testified orally and without objection that Mrs. Mittelberger paid for and was the owner of the property.

·V.   But one question remains and that is whether defendant was properly questioned on cross-examination.   We discover nothing in the questions propounded him contrary to the principles announced in *State v. Avery*, 113 Mo. 475, to which case we adhere.   Therefore judgment affirmed.   All concur.